UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff/Respondent, ) | |
| ) | No. 7:19-CR-16-REW-1 |
| v. ) | No. 7:22-CV-108-REW |
| ) | |
| DANNY COLLINS, ) | OPINION AND ORDER |
| ) | |
| Defendant/Petitioner. ) | |

*** *** *** ***

Defendant/Petitioner Danny Collins moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. *See* DE 266 (Motion). Upon thorough review and following an evidentiary hearing, the Court denies § 2255 relief and issues no certificate of appealability.

I. **BACKGROUND**

   *A.   Initial Proceedings*

On June 27, 2019, Collins was indicted for conspiracy to distribute at least 500 grams of methamphetamine mixture (Count 1), possession of a firearm in furtherance of a drug trafficking offense (Count 2), and possession of a firearm by a felon (Count 4). *See* DE 1 (Indictment). Throughout proceedings, Collins was represented by Richard Hughes, appointed CJA counsel. Prior to trial, the Government offered Collins a plea deal.[1] *See* DE 266-2 (Plea Agreement). Under the plea agreement, Collins would plead guilty to Counts 1 and 2, facing a mandatory minimum

---

[1] Testimony from the evidentiary hearing indicates that Collins received two plea offers from the Government with the second being "tweaked . . . a little bit" with no "substantive difference." *See* DE 304 (Evidentiary Hearing Transcript) [hereinafter Tr.] at 48:17–19, 69:23–70:2. This memorialized plea agreement is the only written agreement in the record, and the Government has represented that mandatory minimum sentences were left unchanged between the versions. *See id.* at 95:21–96:3. A third exploratory plea, which might have implicated § 3553(e) relief from a mandatory minimum, did not come to fruition. *See id.* at 48:20–23.

1

of 20 years' imprisonment. *See id.* ¶¶ 1,4. Because Collins had a qualifying prior "serious drug felony conviction" under 21 U.S.C. §§ 841 and 851, he faced an enhanced statutory sentence on Count 1, moving the mandatory minimum on that offense up to 15 years' imprisonment. *See id.* ¶ 4. Count 2 came with a 5-year mandatory minimum to be served consecutively with Count 1. *See id.* Per the Government's recommendation in the plea agreement, Collins would receive a three-level reduction to his total offense level under U.S.S.G. § 3E1.1(b) due to his acceptance of responsibility. *See id.* ¶ 5. The plea agreement made no representation as to offense level or criminal history category. *See id.* ¶¶ 5–6. The plea agreement included no cap on the sentence, other than the statutory limit, and would have imposed the required minimum at the very least.

Collins rejected the plea offer. At the pretrial conference, after getting a concise census of plea offers, the Court explicitly asked Collins, "Do you feel like Mr. Hughes has kept you well informed on the plea negotiations process?", and "[Y]ou're making the decision today to go to trial; is that right?" DE 298 (Pretrial Conference Transcript) 2:25–3:5. Collins responded "Yes, sir" to both questions. *See id.* Collins proceeded to trial. After a two-day jury trial, Collins was convicted on all three counts. *See* DE 137 (Verdict Form).

Because Collins did not plead guilty, he did not receive the three-level reduction to his offense level at sentencing. Based on a total offense level of 35 (including role, unaddressed in the plea agreement offered) and a criminal history category of III, Collins's sentencing guideline range was 270 to 322 months (210 to 262 months on Counts 1 and 4 plus 60 months consecutive on Count 2). *See* DE 189 (Minute Entry); DE 198 (PIR) ¶ 91. The Court ultimately sentenced Collins to prospective 251 months (191 months on Counts 1 and 4 plus 60 months on Count 2). *See* DE 191 (Judgment) at 2. The sentence reflected a 29-month downward adjustment from 280

2

months under U.S.S.G § 5G1.3(b), to account for time Collins spent in state custody on a related but undischarged term. *See id*.

### B.   Subsequent Developments

Collins appealed his conviction, but the Sixth Circuit affirmed. *See* DE 237 (Sixth Circuit Decision). Following his appeal, Collins filed the instant motion to vacate under § 2255, raising various ineffective assistance of counsel claims. *See* DE 266. After initial briefing, Collins dropped all claims except for his claim that Hughes was ineffective during and relative to the plea-bargaining phase. *See* DE 286 (Status Report). The Court appointed Christy Love as counsel and set the matter for an evidentiary hearing. *See* DE 282 (Order Appointing Counsel). Ms. Love ably discharged her duties in representing Collins in the § 2255 phase.

On February 9, 2024, the Court held an evidentiary hearing on the limited issue of whether Hughes was in effective at the plea stage and "erroneously urged Collins to reject his plea and proceed to trial." *See id.*; DE 300 (Minute Entry). Both Collins and Hughes testified as witnesses at the hearing. Counsel presented their arguments, and the motion was submitted to the Court for consideration.

## II.   STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a federal prisoner may obtain post-conviction relief if his sentence violates the Constitution or federal law, the federal court lacked jurisdiction to impose such sentence, or the sentence exceeds the maximum authorized by law. *See* 28 U.S.C. § 2255(a); *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003) ("In order to prevail upon a § 2255 motion, the petitioner must allege as a basis for relief: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'") (quoting *Weinberger v. United States*,

268 F.3d 346, 351 (6th Cir. 2001)). A defendant alleging a constitutional basis for relief (as here) must establish "an error of constitutional magnitude" and show that the error had a "substantial and injurious effect or influence on the proceedings" to obtain § 2255 relief. *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999). In moving under § 2255, the petitioner generally bears the burden of proving factual assertions by a preponderance of the evidence. *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (per curiam) ("Defendants seeking to set aside their sentences pursuant to 28 U.S.C. § 2255 have the burden of sustaining their contentions by a preponderance of the evidence.").

"'[T]he Sixth Amendment's requirement that defendants receive the effective assistance of competent counsel extends to all critical stages of a criminal proceeding,' including plea negotiations." *Gilbert v. United States*, 64 F.4th 763, 770 (6th Cir. 2023) (quoting *Byrd v. Skipper*, 940 F.3d 248, 255 (6th Cir. 2019)). "Although defendants have no constitutional right to a plea offer, when the Government chooses to enter into plea negotiations, the Constitution requires that defendants receive effective assistance in navigating that crucial process." *Id.* at 771 (citation and quotation marks omitted). A petitioner claiming ineffective assistance of counsel ("IAC") in the plea negotiation context must prove both deficient performance and prejudice. *See Strickland v. Washington*, 104 S. Ct. 2052, 2064 (1984); *Campbell v. Bradshaw*, 674 F.3d 578, 586 (6th Cir. 2012).

To prove deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 104 S. Ct. at 2064. A petitioner meets this burden by showing that, in navigating the plea process, "counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering

4

all the circumstances." *Id.* at 2064–65. Judicial scrutiny of counsel's performance, however, is "highly deferential," featuring a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 2065.

The prejudice inquiry requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. When evaluating prejudice, courts generally must consider the "totality of the evidence before the judge or jury." *Id.* at 2069. To establish prejudice in cases where a defendant rejected a plea offer and instead proceeded to trial, the petitioner must prove "but for his counsel's erroneous advice, there is a reasonable probability that he would have accepted a plea." *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003).

**III. ANALYSIS**

The Court will first consider whether Hughes's performance was deficient under *Strickland*. The defense focuses on two areas of deficiency, both of which allegedly influenced Collins to go to trial and forgo a plea: 1) Hughes failed to give Collins adequate access to discovery, and 2) Hughes misadvised him on the plea agreement. *See* DE 266 at 5–11. Collins claims that as part of discovery review, he only saw controlled buy video footage that showed his co-conspirator Samantha Collins engaging in drug transactions, not him. *See id.* at 5. Because Collins did not have access to all discovery, Hughes led him to believe that the Government's case against him was "weak," prompting him to proceed to trial. *See* DE 304 (Evidentiary Hearing Transcript) [hereinafter Tr.] at 10:22–11:5, 14:14–19. Collins testified that Hughes predicted a "good" chance of acquittal given what the videos showed. *Id.* at 13:25–14:2. In reality, the evidence against Collins was very strong with "few, if any, viable defenses" to combat the Government's case. *See* DE 266 at 6. Moreover, Hughes estimated that the minimum sentence

under the plea agreement would be 240 months; Collins maintains that this estimate was incorrect by 29 months. *See id.* at 9. Collins's argument goes like this: If Collins pleaded guilty, he would have received a three-level reduction to his offense level. *See id.* With an offense level of 32 and a criminal history category of III (all else being equal to the ultimate PIR), his sentencing guideline range would have been 211 to 248 months' imprisonment (151 to 188 months plus 60 months on the § 924). *See id.* Due to the mandatory minimum, the resulting guideline range would have been 240 to 248 months. *See id.* The Court would, so the argument goes, have sentenced him to the low-end sentence of 240 months, but with the like 29-month downward adjustment for served time on the state conviction, his ultimate sentence would have been 211 months. *See id.* According to Collins, Hughes advised him that he had "nothing to lose" by going to trial due to the "lackluster evidence" against him and the 240-month mandatory minimum. *Id.* at 5. Collins contends that, in light of the actual evidence and the potential for a 211-month sentence, Hughes's advice to reject the plea and proceed to trial was objectively unreasonable. *Id.* at 6, 9. If Hughes had advised Collins that an acquittal was "impossible," Collins represents that he would have accepted the plea offer. *Id.* at 7. He also claims that if he'd actually seen all of the discovery before trial, he "would have taken a plea." Tr. 19:1–4.

The Court will address each purported deficiency in turn.

### A.     IAC: Discovery Access

First, the discovery access. Here, Collins and Hughes gave conflicting testimony.

Collins testified that Hughes did not review the complete set of discovery with him. *See* Tr. 10:6–8. Instead, Hughes only presented a flash drive containing the controlled buy footage, and the footage did not show Collins engaging in any drug transactions. *See id.* at 11:1–5 ("didn't show me doing anything with drugs"). Collins stated that, both at trial and when he later received

6

the entirety of the discovery, he realized that the materials were "different" and included evidence that he did not previously see, such as paperwork and "clearer" photographs of the crime scene. *See id.* at 18:9–20, 19:5–8.  According to Collins, Hughes never reviewed ATF police reports, lab reports, or cell phone-related evidence with him.  *See id.* at 12:8–9; 12:18–25.

In contrast, Hughes testified that he met with Collins eight to ten times to discuss discovery and defense strategy.  *See id.* at 43:16–22.  While Hughes did not physically leave the discovery with Collins in custody due to the involvement of a confidential informant, Hughes stated he was "[a]bsolutely" confident that he gave Collins access to all available discovery.  *See id.* at 72:5–16. As part of the discovery review, Hughes maintained that he presented Collins with video footage, audio, and print material depicting Collins's criminal activity.  *See id.* at 43:23–44:13.  The video footage showed Collins discussing drug purchases with the confidential informant and brandishing a firearm.  *See id.* at 52:2–53:2.  The print material included ATF reports of the investigation and Collins's criminal history.  *See id.* at 44:4–7, 44:22–45:7.  Hughes testified that he watched and discussed the videos with Collins and reviewed the print material with him.  *See id.* at 44:18–23, 52:2–53:2.

The point of the hearing was to assess the proof, including questions of credibility. Collins's version of events is simply not credible.  For starters, his testimony is internally inconsistent.  While Collins testified that he only viewed the video evidence once, he also stated that he met with Hughes multiple times in person and over the phone.  *See* Tr. 22:10–15, 31:25–32:6.  Further eroding his credibility and contrary to his representations otherwise, Collins was well aware of the strength of the evidence against him.  He testified that he was informed of the witnesses projected to testify against him at trial, including the confidential informant who conducted the controlled buys in the video footage.  *See* Tr. 31:7–20.  Through his discovery review

7

with Hughes, Collins concedes he saw footage that showed him holding a pistol in his house. *See id.* at 12:2–7. Collins admitted he knew that, as a convicted felon, he was prohibited from possessing a firearm. *See id.* at 27:3–10. He was also aware that law enforcement found firearms and over four pounds of meth mixture in his home and that the relevant footage depicted multiple drug transactions occurring in his house. *See id.* at 12:2–7, 19:19–20:2, 25:16–19, 26:8–11. Collins plainly knew that he had control over the safe where police discovered the large amount of meth and an additional firearm; the safe was located in his home, and he testified that he input the security code to provide law enforcement with access. *See id.* at 36:11–22. Importantly, as the appellate decision noted, only Collins had the combination to that safe. *See* DE 237 at 6 (noting that Samantha Collins did not have the combination, but Danny Collins did). This cements that Collins well knew the Government's striking proof that he was in control of aggravated quantities of meth, along with firearms, in a home at which eight controlled buys (many, with Collins directly implicated, including one showing firearm usage relative to a buy) occurred.

At trial, Collins also stipulated to a range of facts, including that that he was a felon and that the drugs seized from his home and subsequently tested contained meth. *See* DE 140 (Phase I Stipulations). Critically, Collins entered a previous guilty plea on the related state matter, again indicating that he was aware that the existing evidence was enough to yield a conviction. *See* Tr. 20:3–5; PIR ¶ 56 (referencing February 2019 state plea for complicity to TICS 1st (meth)). Knowing what he knew, based on his own admissions (and irrespective of what other discovery materials he did or did not view), Collins was familiar with the scope of proof in this case and yet chose to proceed to trial. The record also shows that Hughes covered the tendered plea agreement with Collins. *See* Tr. 22:16–18. That agreement included a summary of the buy video that supported the gun and conspiracy counts. *See* DE 266-2 ¶ 3.

8

At the same time, Hughes convincingly testified, in detail, that he gave Collins full and complete access to all discovery in this case. *See* Tr. 72:5–8. In his testimony, Hughes catalogued the range of discovery materials that he reviewed with Collins. *See id.* at 44:12–45:7, 52:2–25. Objective evidence in the record also supports Hughes's testimony that he met with Collins upwards of eight times to discuss discovery and defense strategy. *See id.* at 43:16–22. The eVoucher content (a submission detailing the hours Hughes spent on a given task in representing Collins) shows that Hughes consulted with Collins approximately 16 times before trial over the course of 30+ hours. More than nine of those hours and three of those visits were specifically dedicated to discovery review. The Court finds it implausible that, as Collins's story goes, he saw only a part of the video proof, but essentially no other discovery, in a cursory meeting dedicated to discovery assessment. Notably, the length of trial (which included the CI's testimony in support of the video buys) was only 11 hours from start to finish. *See* DE 135 (Minute Entry, Trial Day 1); DE 136 (Minute Entry, Trial Day 2). Given the compact field of relevant proof, the nine hours of discovery review are more consistent with Hughes's account of the process—a full review of the audio, video, and print discovery in this case.

Based on objective record support, his comprehensive identification of the discovery materials, and the coherent and persuasive nature of his testimony, the Court credits Hughes's version of events as to the extent of the discovery review process. The Court accordingly finds that Hughes gave Collins adequate access to the discovery materials and that Collins was sufficiently familiar with the proof in this case prior to trial. As it relates to discovery access, Hughes's representation of Collins was objectively reasonable, and therefore, his performance was

9

not deficient. *Strickland*, 104 S. Ct. at 2064.[2] Collins, no novice in the criminal process, had proper and reasonable access to the discovery and to counsel in the defense of the case.

### B. IAC: Plea Agreement Advice

Because the Court finds that Hughes gave Collins full access to discovery and that Collins had ample knowledge of the evidence against him, most of his misadvice predicate falls. The Court's findings are contra to Collins's assertion that if Hughes properly advised him as to the strength of the Government's case, he would not have proceeded to trial. The contention that Hughes thought (thus communicated to Collins) that the Government's case was weak, *see* Tr. 10:22–11:1, 14:14–19, is not credible. This is equally fatal to Collins's misadvice claim. Hughes emphatically reiterated the opposite in his testimony in multiple instances. *See* Tr. 53:5–7 ("[W]hen I first saw the video, it was pretty much . . . pretty much locked down the case. I mean, . . . they were very damaging videos."); *id.* at 68:3–7 (denying that he thought the Government "had a weak case"); *id.* at 74:16–17 ("There wasn't a lot of meat on the bone on this for defense."); *id.* at 74:25–75:5 (Collins's testimony that Hughes "told him the government had a weak case . . . [was n]ot even close to being accurate."); *id.* at 80:8–9 ("[Collins] knew that there was a slim chance of doing anything other than he was going to be convicted at trial."); *id.* at 80:12–15 ("I think that [Collins] went to trial knowing that" a conviction was "a high probability"). That Hughes was aware of and had access to all the proof in the case (as he recounted in his testimony and as Collins testified, *see* Tr. 15:12–16:8) but viewed the evidence as insufficient to garner a conviction is illogical. The Court finds that, based on his testimony, Hughes did not regard or

---

[2] Ms. Love raised several criticisms regarding Hughes's recordkeeping and manner of documentation. *See, e.g.,* Tr. 88:19–21. Hughes certainly was a casual clerk and relied mostly on oral communications (and thus, his memory) when it came to reformulating the history. *See id.* at 58:13–59:3, 60:9–60:11. As further discussed below, the question is not whether Hughes meets the highest standards or employs ideal practices; the question is whether he rendered effective assistance to Collins.

10

portray the Government's case as weak. Again, police found Collins passed out in a car containing 26 grams of meth (*see* PIR ¶ 19), found 4+ pounds and a firearm in a safe Collins alone controlled, and had Collins on video, with a gun, directly involved in a meth sale. This is proof Collins lived in real time. Hughes plausibly viewed a conviction as likely—the claim that he forecasted a win for Collins has the tinniest of rings.[3]

The plea agreement itself was contingent on Collins pleading guilty to Count 1 (conspiracy to distribute at least 500 grams of meth mixture) and Count 2 (possession of a firearm in furtherance of a drug trafficking offense). *See* DE 266-2 ¶ 1. A plea to those offenses plus the enhanced statutory punishment under § 851 set the statutory minimum at 20 years; that is, even if Collins pleaded guilty, he faced a 20-year floor. *See id.* ¶ 4. As noted in the plea agreement, the statutory maximum for the offenses was life imprisonment. *See id.* Against that backdrop, the Court concludes that Collins's decision to forgo the plea agreement and go to trial was his own and not at the insistence of Hughes. The Court reaches this conclusion for several reasons.

First, statements in the record (as judged, in part, on witness credibility) establish that Collins chose to proceed to trial on his own accord. Hughes credibly testified that after he "laid out" the relevant points for consideration, Collins's decision to go to trial was "his alone." Tr. 56:16–57:1. Notably, at the pretrial conference, Collins confirmed that "[he was] making the decision today to go to trial." DE 298 at 3:3–3:5. Hughes also denied that he advised Collins to proceed to trial. *See* Tr. 67:22–68:2.

Supporting his recall of events, Hughes plausibly described Collins's probable mindset during plea negotiations. As Hughes expressed, given Collins's age (nearly 65 years old at the time of trial), 20 years' imprisonment was potentially an effective life sentence for Collins, and

---

[3] Collins incredibly claims that the trial proof "shocked" and "flabbergasted" him. *See* Tr. 19:5–8. This is not a believable portrayal.

11

any time imposed beyond those 20 years was essentially inconsequential. *See* Tr. 53:17–23 ("At his age, even when, on a best-case scenario, we added up the possibilities. I mean, for him, he considered that, that he would die in prison, and so it didn't make any difference if you, you know, got an extra 20 months or 50 months, or whatever."). Barring a significant reduction in the mandatory minimum, Collins's belief was that a guilty plea or conviction would result in a functional life sentence. *See id.* at 53:24–54:6. Hughes testified that since the plea offers resulted in only "very minimal reductions" to the overall sentence that were "still far in excess of what [Collins] would have found acceptable . . . because of his age," Collins was not interested in accepting the offers. *See id.* at 49:3–5, 69:10–12. None of the plea offers breached the mandatory minimums. Because he would still face a significant sentence if he pleaded guilty, Collins decided that he "might as well go to trial." *See id.* at 54:2–3. Hughes's depiction of Collins as taking a slim chance of acquittal over the assured result of at least 20 years' imprisonment under the plea agreement reflects a credible assessment of Collins's thinking.

      Next, Collins was appropriately aware of the terms of the plea agreement and the impact that a plea would have on his potential sentence. He admits that he saw a copy of his criminal history and that Hughes reviewed the terms of the plea agreement with him. *See* Tr. 12:10–11, 22:16–21. Collins also testified that he knew the statutory exposure associated with the charges and that Hughes explained that the guilty plea would result in an offense level reduction. *See id.* at 26:22–27:2, 34:15–20. Moreover, at the pretrial conference, Collins assured the Court that Hughes "kept [him] well informed on the plea negotiations process." DE 298 at 2:25–3:2. Hughes's testimony was largely consistent with Collins's on this front. Hughes acknowledged that he and Collins discussed the proposed plea agreement, the acceptance of responsibility credit, the statutory mandatory minimums implicated, and Collins's criminal history. *See* Tr. 44:24–45:7,

45:8–25, 64:20–65:4, 68:8–12. While Collins could not definitively remember whether Hughes discussed a sentencing guideline range with him, he claims that he knew that he would receive a 20-year sentence if he pleaded guilty and "to [his] knowledge" he could not get more than that. *See id.* at 14:3–7, 32:24–33:1, 35:11–14. At best, Collins's assertion is questionable and implausible. Hughes flatly denied the notion that he advised Collins that he could not receive a sentence greater than 240 months. *See* Tr. 46:21–22 ("I'm sure I never ever told him that there is no way he could ever get more than 240."); *id.* at 47:7–47:8 (Collins "well knew that there would be something in excess of 240."); *id.* at 51:4–7 (denying that he "ever advise[d Collins] that there was no way that he would receive more than 240 months, even if . . . he lost at trial"). Hughes— an attorney with over 45 years of experience who has been a member of this district's CJA panel since the mid-1980s—reliably testified as to his standard procedure in addressing a defendant's sentencing exposure. *See id.* at 47:12–48:6, 62:20–23. After consultation with the U.S. Probation Office, Hughes reviews the statutory minimum and maximum sentences with defendants "from the outset." *See id.* at 47:14–48:6, 59:20–60:8. And he "always bring[s] the sentencing manuals" to discuss the guideline ranges with defendants. *Id.* at 59:20–24. Hughes testified that he followed that same procedure in advising Collins. *Id.* at 48:4–6, 60:2–3. The Court also covered the minimum and maximum sentence components at Collins's arraignment. DE 33 (Minute Entry).[4]

In light of Collins's admission that Hughes reviewed the plea agreement with him, his assurance that he was "well informed" on plea negotiations, and Hughes's testimony about this case and his established consultation process with his clients, the Court finds that Hughes

---

[4] Notably, Collins claims Hughes assured him, at one point, that 240 months would be his sentence irrespective of plea or trial. *See* Tr. 32:20–23. The plea agreement made no such promises, and it was plain that Collins faced two counts that were Class A felonies, each with a potential life term. The notion that Hughes said Collins had nothing to lose at trial simply does not square with the probative record or the logic of sentencing risk.

13

adequately apprised Collins of his potential punishment under either the guilty plea or the guilty verdict scenario. Inaccurate advice regarding sentencing exposure in the plea negotiation phase can constitute deficient performance. *See Gilbert*, 64 F.4th at 771. That is not the case here. Collins knew of the substantive plea agreement terms and independently chose to reject the offer and go to trial, forgoing the modest benefit of the plea, embracing the slim chance of acquittal, and accepting the open-ended risks from a trial verdict.

Finally, Collins's claim that he would, if properly counseled, have accepted the plea offer from the Government is self-serving, revisionist history. Even at the evidentiary hearing, Collins waffled on whether he would have accepted a plea to Counts 1 and 2 at the 240-month minimum. *Compare* Tr. 37:8–14 ("The Court: "[Y]ou're not sitting here today telling me you would have accepted a plea deal that included the 500 gram meth conspiracy and the 924(c); thus, resulting in . . . a 20-year mandatory minimum. You're not saying you would have accepted that? [Collins]: . . . No, sir.") *with id.* at 40:12–22 ("[The Government]: You would have took that deal? [Collins]: I would have took that deal. I got confused a while ago, but I would have taken a plea deal at 240 months."). Instead, Collins repeatedly, confusingly, took the position that he, with full knowledge and good advice, could have "negotiated" a better deal that lowered the charged quantity or removed the firearm charge. *See id.* at 17:22–25, 37:15–18, 41:8–15. The record shows that such a deal was never a possibility—as Collins knew, the Government never wavered on its stance that any plea agreement would necessarily include a plea to Counts 1 and 2. *See id.* at 17:8–15, 49:6–14, 70:23–71:4. Collins's view is also contradictory; he testified that the hypothetical negotiations were contingent on him having full access to discovery. *See id.* at 37:15–18, 41:8–15. That is, if Collins had seen all of the discovery, he could have gotten a better deal. *See id.* If, as Collins contends, the discovery actually revealed that the Government had a strong case against him, how

14

could he use that admittedly damaging discovery as improved negotiating leverage against the Government? And why would the Government have an incentive to negotiate a more favorable offer? In an effort to strain the record to fit his narrative, Collins twists himself into an illogical bind.

Based on testimony, the only way that Collins could breach the mandatory minimum components was through a proffer that could result in cooperation credit. Tr. 20:17–21:10, 49:15–50:20. While Collins explored that option, the endeavor did not bear fruit. *See id.* The fact that Collins attempted a proffer, a way to circumvent the statutory floor, is further proof that he would not agree to a plea that came with a 20-year mandatory minimum. The Court is thoroughly unconvinced that Collins would have accepted the Government's offer as it stood.[5]

Two additional points are worthy of mention.

One, Hughes testified that in the ordinary course of his practice, he does not provide clients with summary letters outlining their sentencing exposure or otherwise memorialize his meetings with clients in writing. *See* Tr. 58:13–59:3, 60:9–60:11. This likely is below what the Court considers "best practices." But "best practices" are not what *Strickland* demands. *See Upshaw v. Stephenson*, 97 F.4th 365, 371 (6th Cir. 2024) ("'[P]revailing professional norms,' not 'best practices' or 'common custom,' define this constitutional standard.") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011)). Further, Hughes's documentation mostly influences the nature and quality of proof in a retrospective proceeding.

---

[5] Nor is Collins's guilty plea to the related state offense indicative of his willingness to accept the federal offer. Seven years' imprisonment (his state sentence) is a far cry from the proposed 20-year term, particularly considering parole inapplicability at the federal level. PIR ¶ 56. Indeed, the state plea, to the Court, signifies Collins's familiarity with the record and his recognition of proof indicative of guilt beyond a reasonable doubt. That, as matters of knowledge and logic, cuts against his entire theory in the § 2255 context.

Two, both Collins and Hughes testified that Hughes advised that federal courts usually impose federal sentences consecutive to related state sentences. Tr. 33:18–25, 71:17–25. Hughes's guidance, along with his understanding, skirted past and oversimplified a complicated issue.[6] The issue is intertwined with another open question: Would the Court even have had the authority to adjust Collins's sentence below the 240-month mandatory minimum to 211 months, to account for state credit under § 5G1.3(b)? When probed at the evidentiary hearing, counsel for both parties denied the Court's power to do so. *See* Tr. 103:11–15. The lone Sixth Circuit decision on the question—a table decision—suggests that the statutory mandatory minimum controls. *See United States v. Collins*, 188 F.3d 509 (Table) 1999 WL 717961, at *9 n.12 (6th Cir. 1999) ("As the Commentary of § 5G1.3, n.2, points out, a sentence under subsection (b) that gives credit for a period in custody on a prior sentence and which, as a result, is below the guideline range, is not considered a departure from the applicable guideline range. While this is true for guideline purposes, the statutory mandatory minimum requirement is still applicable to the imposed sentence."). As the Court noted at the hearing, *see* Tr. 103:16–24, other federal circuit courts[7]

---

[6] *See, e.g.,* 18 U.S.C. § 3584(a) ("If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively . . ."); U.S.S.G. § 5G1.3(b) ("If . . . a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction[,] the sentence for the instant offense shall be imposed as follows: (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and (2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment."); *id.* § 5G1.3(d) ("In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.").

[7] The Second, Seventh, Eighth, and Ninth Circuits have approved adjustments below a mandatory minimum under § 5G1.3(b). *See, e.g., United States v. Rivers*, 329 F.3d 119, 122 (2d Cir. 2003) ("So long as the total period of incarceration, after the adjustment [under § 5G1.3], is equal or greater than the statutory minimum, the statutory dictate has been observed and its purpose accomplished."); *United States v. Ross*, 219 F.3d 592, 595 (7th Cir. 2000) ("We conclude the computation of the total term of imprisonment . . . may,

16

have also explored the issue. Currently, at least in the Sixth Circuit, the Court's power to adjust a defendant's sentence below the mandatory minimum pursuant to § 5G1.3(b) remains undefined. That said, a § 5G1.3(b) adjustment does not change the statutory mandatory minimum but rather, may conceivably alter how the mandatory minimum is calculated or satisfied when considering state credit. On this record, the Court cannot find that Hughes fully grappled with the nuances of the interplay between related state and federal sentences. At the same time, he may have been right that the minimum sentence would get no relief or adjustment relative to the state term. Regardless of how state credit was ultimately applied, however, the Court is confident and finds that Collins would not have accepted a deal that defined 240 months as the minimum sentence. That is the only deal he faced and eschewed.

 The Court has considered the full record. Collins fails to establish that his decision to go to trial was the result of any erroneous advice from Hughes. The record contains no credible suggestion of material misadvice. Collins's choice to proceed to trial and forgo the Government's plea was his own, a confluence of his informed understanding of the potential sentencing exposure, his mindset about the mandatory minimums, and his refusal to accept an offer that set the floor at the minimum. Therefore, the Court finds that Collins has not proven that Hughes's performance was deficient in the plea-advice phase.

---

consistently with Application Note 2 to § 5G1.3, be accomplished by adding up the number of months the defendant has served on the related conviction and the number of months assessed in the federal judgment. The total must equal or exceed the statutory mandatory minimum[.]"); *United States v. Drake*, 49 F.3d 1438, 1440-41 (9th Cir. 1995) ("[W]e conclude that the district court indeed was required to reduce [Defendant's] mandatory minimum sentence for the time [Defendant] served in [state] prison" pursuant to § 5G1.3(b).); *United States v. Kiefer*, 20 F.3d 874, 877 (8th Cir. 1994) ("Therefore, the district court erred in stating that it had *no* discretion under § 5G1.3(b) to reduce [Defendant's] mandatory minimum sentence for the time he served in state prison as a result of the same course of conduct.") (emphasis in original).

Because Collins has not met his burden to show that Hughes's performance was deficient, his petition fails in its entirety, and the Court need not reach the question of prejudice.[8] *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) ("When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'") (quoting *Strickland*, 104 S. Ct. at 2069).  Accordingly, the Court rejects Collins's motion for § 2255 relief.

## IV.   CERTIFICATE OF APPEALABILITY

A certificate of appealability may issue where a petitioner has made a "substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2).  This standard requires a petitioner to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000).  The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. *See* 28 U.S.C. § 2253(c)(3); *Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005) (noting requirement of "individualized assessment of . . . claims") (citing *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)).  Collins has not made a "substantial showing" as to any claimed denial of rights; his *Strickland* claims conclusively fail for all the reasons discussed above.  Reasonable jurists would not find the Court's determination debatable, and accordingly, the Court will not issue a certificate of appealability.

---

[8] Prejudice would be a high bar.  Collins at one point directly told the Court he would not, if advised correctly and with full discovery access, have taken the offered plea.  He testified instead that he would have used the better understanding to negotiate a lighter deal.  That path is fantasy, on this record and given the proof the Government held. *See* Tr. 37:2–18 (testifying he wanted a plea "to get some reduction other than 240 months" and agreeing he would simply have sought to negotiate a better deal if he had full knowledge).  The United States flatly denied the potential for a plea, other than via the third option considered and § 3553(e), that would take the 20 years off the table.

V.   **CONCLUSION**

For the foregoing reasons, the Court **DENIES** DE 266 in full and issues no certificate of appealability as to the raised claims.

This the 27th day of June, 2024.

Signed By:
Robert E. Wier   REW
United States District Judge